UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINA MARTH, | : | Electronically Filed |
| Plaintiff, | : | |
| | : | No. |
| V. | : | |
| | : | Judge: |
| PENNSYLVANIA STATE POLICE, | : | |
| and CAPTAIN STEPHEN J. U'SELIS | : | |
| individually, and KREG RODRIGUES | : | |
| individually. | : | Civil Action Law |
| Defendants. | : | |
| | : | JURY TRIAL DEMANDED |

# COMPLAINT

**AND NOW,** come the Plaintiff, Christina Marth, by and through her attorneys, The Hanchulak Law Offices, P.C., and avers as follows:

## I. INTRODUCTION

1. Plaintiff initiates this action to seek redress against Pennsylvania State Police (hereinafter "PSP"), her employer, Captain Stephen J. U'Selis, individually, and Kreg Rodrigues, individually, for unlawful sex and gender discrimination in violation of the Civil Rights Act of 1964, as amended, the Pennsylvania Human Relations Act, violations of Plaintiff's Constitutional rights under the color of state law and other applicable laws.

## II. PARTIES

2. Plaintiff is an adult and competent individual residing at 28 Bowen Road, McDonald, PA 15057.

3. Defendant, Pennsylvania State Police, is a governmental agency with a principal place of business located at 1800 Elmerton Avenue, Harrisburg, PA 17110.

4. Defendant, Stephen J. U'Selis, is an adult and competent individual, who was at all times relevant hereto employed by the Respondent, Pennsylvania State Police, at 1800 Elmerton Avenue, Harrisburg, PA 17110.

5. Defendant, Kreg Rodrigues, is an adult and competent individual, who was at all times relevant hereto employed by the Respondent, Pennsylvania State Police, at 1800 Elmerton Avenue, Harrisburg, PA 17110.

### III. JURISDICTION

6. Defendant, PSP, is an "employer" within the meaning of the meaning of the Federal Civil Rights Act, as it engaged in an industry affecting interstate commerce and because it maintained or maintains fifteen (15) or more employees for each working day in each of twenty or more weeks in the current or preceding calendar year.

7. Defendant, PSP, is an "employer" within the meaning of the meaning of the Pennsylvania Human Relations Act because it maintained or maintains four (4) or more employees.

8. Defendant, U'Selis is a proper individual defendant under the Pennsylvania Human Relations Act (PHRA) for engaging in, assisting aiding, abetting, inciting or coercing acts of discrimination as set forth below, and is likewise a person within the meaning of 42 C.S.A. § 1983.

9. Defendant, Rodrigues is a person within the meaning of 42 C.S.A. § 1983.

10. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

11. This court has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367.

12. Venue is proper in the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391 because the PSP are headquartered in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## IV. FACTUAL BACKGROUND

13. Plaintiff is employed with the PSP as a Pennsylvania State Trooper, holding the rank of Corporal, and the position of Western Canine Supervisor, for Troop B, Pittsburgh.

14. Plaintiff has been employed with the PSP since February 9, 2009.

15. Plaintiff is a female, and the first and only female to serve in the unit.

16. On September 5, 2023, Plaintiff expressed her interest in any canine-related training opportunities, specifically tracking.

17. In January of 2023, Plaintiff discovered that two of her male colleagues, Cpl. Carlson, and Cpl. Michelitsch were selected for a trailing and tracking training in Artesia, New Mexico. This opportunity had not been posted in violation of the PSP's own policy, which states in Section 9, "training that is not rotational and is limited in attendance must be posted for 15 days and awarded by seniority." Major Rodrigues was in the approval process for all Out of State Training requests, so he would have had knowledge that this was in violation of their contract.

18. Upon discovering there was a trailing and tracking training that had not been posted, and that Plaintiff was not informed of despite her earlier email inquiry, she asked why the opportunity was not posted, and she was told that Captain U'Selis had claimed that sending a female would be too expensive.

19. Plaintiff was further advised that if the training had been posted, Plaintiff would not have been selected anyway, due to seniority. However, Plaintiff joined the Canine Unit in 2015, while Carlson joined in 2018. Plaintiff and Carlson were both promoted on the same day in 2021. By all standards, Plaintiff had seniority over both Carlson and Michelitsch.

20. In December of 2023, Plaintiff's uncle passed away, and the funeral conflicted with promotion oral boards she had scheduled. Plaintiff asked Sgt. Kalinchock if she could attend oral boards in the afternoon rather than in the morning so she could attend the funeral. It is important to note that Plaintiff did not want to reschedule her oral boards for the following week because she had trainings the following week.

21. Plaintiff was told by Kalinchock that Captain U'Selis said that Plaintiff had to choose what was most important to her promotion oral boards, training, or the funeral. Kalinchock disagreed with U'Selis' decision, and chose to call Human Resources himself, and was told by Human Resources that there were multiple openings that would not conflict with the funeral, or with the trainings. Kalinchock scheduled Plaintiff for a new board date that was not in conflict.

22. After rescheduling Plaintiff's boards on her behalf, Kalinchock called U'Selis and informed him that he had scheduled Plaintiff for a new board date. At this time, U'Selis admitted to Kalinchock that he had intentionally only asked Human Resources for dates that

conflicted with Plaintiff's trainings. Kalinchock told this to Plaintiff and added that he did not understand why the captain disliked Plaintiff.

23. In June of 2024, Sgt. Kalinchock left the canine unit for a different position, leaving the Corporal/Sergeant K9 Handler/Instructor role vacant.

24. The vacant position was posted in August of 2024.

25. Plaintiff and Carlson were the only applicants for the vacant position.

26. On September 3, 2024, Carlson and Plaintiff tested for the role. That same day, Plaintiff was called into Captain Moy's office and informed that she did receive the higher overall score.

27. On her drive home that same day, Plaintiff received a call from Trooper Steven Nesbit from the union. Nesbit asked Plaintiff if she knew who got the position and whether Plaintiff believed the process was fair. Plaintiff was confused by this inquiry as she believed based upon her conversation with Captain Moy, that she would be getting the position based upon her higher score.

28. Nesbit further advised that Plaintiff's score was 29/30, while Carlson's score was 28.5/30, and when rounded up the scores were the same at 29/30. He told Plaintiff that since her and Carlson's promotion dates were the same, the tiebreaker would be their date of enlistment. Plaintiff had more years on the job than Carlson and shared this with Nesbit.

29. Nesbit then announced the decision would rely on a Human Resources assigned random lottery number. Plaintiff contacted a friend in Human Resources who indicated Plaintiff had the higher number.

30. In mid-September, Nesbit announced that the testing process would be reviewed due to a procedural issue involving supervisor evaluations. This review would undermine the initial outcome of the process and further delay the decision.

31. Plaintiff was confused as to how her and Carlson's scores were close enough to prompt a review of the testing process, and she raised this concern with Nesbit, first asking how resumes were graded. Nesbit explained that the completion of various classes were assigned different point values- "for example, a wiretap class would earn an additional point." Plaintiff noted that she had completed the wiretap class, and Carlson had not. Nesbit quickly responded that points for that class might not have been applicable for this position.

32. Plaintiff then asked Nesbit about the scoring rubric or matrix used to assign these points, and Nesbit informed Plaintiff that there was no matrix established. Plaintiff was not satisfied with this and told Nesbit that she was concerned the process appeared arbitrary and lacked transparency.

33. Plaintiff notes that while her and Carlson apparently received full resume points in the scoring process, the position was for a supervisory role, and since their promotion to corporal in 2021, Plaintiff had consistently served in a supervisory capacity, while Carlson has promoted in place, and had not consistently served in a supervisory role. Regarding the canine experience, Plaintiff has served as a handler in the military, had been an instructor longer than Carlson, and had more tenure in the unit. Additionally, Plaintiff had courtroom testimony experience relating to the training, certification, and deployment of canines, which Carlson had not.

34. One of the few distinctions in Carlson's favor was the tracking and trailing course which Plaintiff was never offered due to her gender.

35. On November 19, 2024, Plaintiff received an email from Captain Moy explaining that the position would not be filled due to operational needs, despite continued use of rotating acting supervisors.

36. Around this time there were internal discussions regarding the possibility of reclassifying the Section Supervisor position to an administrative-only, non-handler role.

37. On December 5, 2024, Plaintiff submitted an email to Captain Moy outlining several reasons why Plaintiff believed reclassifying the Section Supervisor position in this way would be detrimental to the effectiveness and operational integrity of the unit. Moy indicated that the topic would be revisited during the scheduled unit supervisors' meeting later that month.

38. Plaintiff believed the consideration for reclassification of the position was part of an effort to exclude her from consideration for the role, as it was well known among command staff that Plaintiff would not apply for the role if it were converted to a non-handler position.

39. Plaintiff notes that if the initial selection process had not been invalidated, she would have been selected for the role, and that the core responsibilities of the role, as well as the selection process, only came under review after Plaintiff became a viable candidate for the role.

40. In December of 2024, Plaintiff was asked to serve as Acting Section Supervisor until the position was permanently filled, which Plaintiff accepted. Command staff informed

Plaintiff that this period would serve as a trial period to determine whether Plaintiff could successfully perform the duties of the role, along with her canine duties. None of the previous Section Supervisors, all of whom were male, were ever asked to undergo a trial period to demonstrate their capabilities prior to being awarded the role.

41. Around this time, Plaintiff had developed strong working relationships with the unit supervisors, specifically, Cpl. Mark Conrad, and Cpl. Anthony Doblovasky. Plaintiff frequently collaborated with Conrad and Doblovasky when making decisions about the direction of the unit, because she believed a unified approach would lead to greater efficiency and overall success.

42. It is of note that Plaintiff recognized that her affiliation with Cpl. Conrad and Cpl. Doblovasky carried a risk, as it was widely known amongst the unit that Rodrigues did not favor Conrad or Doblovasky.

43. It is believed and therefore averred that the reason Rodrigues came into conflict with Conrad and Doblovasky was due to their public support of former republican representative of Pennsylvania, Lou Barletta.

44. The aforementioned conflict between Rodrigues and Conrad, and Doblovasky originating from their support of Lou Barletta and the Republican party is evidenced by Rodrigues' actions toward Conrad and Doblovasky upon learning of their support for Barletta.

45. In May of 2021, Mr. Barletta announced his candidacy for governor in the Republican primary.

46. At this time, another Trooper [Trooper 3 for our purposes] within the unit, a registered Republican, a relative [Mr. Barletta] and a supporter of Barletta's candidacies for Congress, the Senate and Governor, was close with Mr. Conrad and Mr. Doblovasky.

47. Mr. Conrad and Mr. Doblovasky, also registered Republicans, openly supported Lou Barletta during his election campaigns. Mr. Conrad and Mr. Doblovasky attended rallies and vocally expressed their support for Mr. Barletta at a variety of functions.

48. Around this time, it is believed and therefore averred that Rodrigues had complained of Trooper 3's affiliations with Mr. Barletta. At this time, Barletta was heavily involved in Pennsylvania Republican party politics.

49. Once Plaintiff's working relationship with Conrad and Doblovasky became well known within the unit, Plaintiff noticed further decline in rapport with command staff, particularly Rodrigues. It is believed and therefore averred that this decline in rapport with Rodrigues was heavily influenced by Plaintiff's affiliation with Conrad and Doblovasky.

50. While serving as Acting Section Supervisor, Plaintiff received numerous emails affirming her strong performance in the role and recognizing her contributions in the field.

51. During this time, Plaintiff had turned down Sergeant opportunities, because she believed based on feedback and encouragement from command staff, that her success in the Acting Section Supervisor role would lead to a permanent position.

52. On May 9, 2025, Cpl. Carlson and Plaintiff received an email from Captain Moy notifying them that the department would be moving forward with testing for the Section Supervisor position. The email also stated that the role would now be classified as

administrative-only, removing the canine handler component. The test was scheduled for May 27, 2025.

53. One week prior to the test, Plaintiff received a phone call from the captain advising that the test was cancelled and the position would continue to be placed on hold. During this call, Plaintiff expressed concerns for the canine handler component of the role being removed, and on May 19, 2025, Plaintiff submitted a written justification detailing why she believed it was essential for the Section Supervisor position to remain handler/instructor role. Although the Captain said he would bring Plaintiff's concerns to a meeting, and advocate for the position to remain unchanged, Plaintiff's request to attend the meeting was denied.

54. Feeling that her concerns about the canine position, as well as only having three instructors in the unit, were being disregarded, Plaintiff submitted an email to Captain Moy on May 22, 2025, requesting consideration for in-place promotion to Sergeant, for both her and Cpl. Carlson. Despite Plaintiff's strong performance, this request was denied. It is important to note that retaining instructors was essential at this time, as multiple inquiries regarding participation in instructor-certification training had garnered no interest from other members, and as instructors are responsible for conducting new-handler courses, as well as annual certification requirements, their retention is critical to the continued operation and readiness of the unit.

55. Following the command staff's meeting with Lt. Col. Bivens, Plaintiff was advised that Bivens had remained opposed to keeping the position a handler role. In response, Plaintiff informed command staff that she would not be submitting for the new posting once it

was issued. She further informed them that if she had known the role would become a non-handler position, she would have explored making a different career decision.

56. On June 6, 2025, the Section Supervisor position was reposted as a non-handler role. Plaintiff chose not to apply.

57. On June 18, 2025, Plaintiff informed the union she wished to file a grievance, providing a detailed list of the differences in the postings.

58. On June 20, 2025, while Plaintiff was away for military duty, the grievance was submitted.

59. On July 1, 2025, Plaintiff was notified that the grievance had been denied.

<u>**Count I**</u>
<u>**GENDER DISCRIMINAITON PURSUANT TO TITLE VII OF CIVIL RIGHTS ACT OF 1964, AS AMENDED 1991, 42 U.S.C §2000, ET SEQ.**</u>
<u>**PLAINTIFF V. PSP**</u>

60. The preceding paragraphs are incorporated by reference as though set forth fully herein.

61. Plaintiff is female.

62. Plaintiff was at all relevant times qualified for the position of Section Supervisor. This is evidenced by Plaintiff's degree in Organizational Leadership, her experience in military leadership roles and supervisory training courses with the military on an annual basis, her experience in supervisory roles with the PSP, tenure in the unit, and completion of several classes and courses offered by PSP, as well as her outstanding work performance, her performance as Acting Section Supervisor, and her scores in the original testing for the position.

63. As is set forth above, members of the opposite sex, who were similarly situated were treated more favorably than Plaintiff. Particularly, Cpl. Carlson was treated favorably over Plaintiff who was the first and only female serving in their unit.

64. Based upon her gender, Plaintiff was denied training and penalized for lacking the training she was denied.

65. Based upon her gender, the criteria for the position she was trying to obtain were manipulated and altered to the effect of denying or delaying her promotion to that position.

66. When it became clear that the Plaintiff would prevail and obtain the section supervisor position, the PSP manipulated and altered the job description to one that would not be appealing to the Plaintiff.

WHEREFORE, Plaintiff respectfully requests judgement in her favor and against Defendant, PSP, and an award of compensatory damages, back pay, front pay, the value of lost benefits, punitive damages, costs, attorney's fees, and such other relief as may be just, proper, and appropriate in the circumstances of this case.

### Count II
### GENDER DISCRIMINAITON PURSUANT TO
### THE PENNSYLAVNIA HUMAN RELATIONS ACT
### PLAINTIFF V. PSP

67. The preceding paragraphs are incorporated by reference as though set forth fully herein.

68. The above-described conduct constitutes gender discrimination under the PHRA.

WHEREFORE, Complainant respectfully requests judgement in her favor and against Defendant, and an award of compensatory damages, back pay, front pay, the value of lost benefits, punitive damages, costs, attorney's fees, and such other relief as may be just, proper, and appropriate in the circumstances of this case.

### Count III
### INDIVIDUAL LIABILITY FOR GENDER DISCRIMINAITON PURSUANT TO THE PENNSYLAVNIA HUMAN RELATIONS ACT
### PLAINTIFF V. STEPHEN U'SELIS

69. The preceding paragraphs are incorporated by reference as though set forth fully herein.

70. Based upon the above-described conduct, Captain Stephen J. U'Selis aided and abetted gender discrimination against Plaintiff.

71. Pursuant to 43 P.S.§ 955(e) it is unlawful for any individual employee to aid and/or abet any unlawful discriminatory practice under the PHRA.

WHEREFORE, Plaintiff respectfully requests judgement in her favor and against Defendant, and an award of compensatory damages, back pay, front pay, the value of lost benefits, punitive damages, costs, attorney's fees, and such other relief as may be just, proper, and appropriate in the circumstances of this case.

### COUNT IV
### 42 U.S.C. §1983 FIRST AMENDMENT RETALIATION- POLITICAL ASSOCIATION AND SPEECH
### PLAINTIFF v. RODRIGUES

72. The preceding paragraphs are incorporated by reference as though set forth fully herein.

73. Plaintiff's position was not a position for which a political association requirement would be appropriate.

74. Plaintiff engaged in protected speech and association through her relationship with Mr. Conrad and Mr. Doblovasky and their association with Lou Barletta.

75. Rodrigues was fully aware that Plaintiff was engaging in a close working relationship with Conrad and Doblovasky, and that Conrad and Doblovasky were publicly supportive of Lou Barletta, and the republican party, particularly through attending rallies and vocally expressing their support for Barletta at a variety of functions.

76. Rodrigues' targeting of Plaintiff is due to Plaintiff's association with Mr. Conrad and Mr. Doblovasky, and their support for Mr. Barletta and the Republican party.

77. Rodrigues had no justification for treating, and continuing to treat, Plaintiff differently.

78. Plaintiff's speech and association is a matter of public concern protected by the First Amendment.

79. Plaintiff was at all times relevant hereto speaking as a citizen.

80. Rodrigues' conduct therefore was a deprivation, under the color of state law, of rights guaranteed to Plaintiff under the First and Fourteenth Amendments of the United States Constitution.

81. As a result of Rodrigues' violations of Plaintiff's Constitutional rights, Plaintiff suffered, and continues to suffer, substantial injuries and damage.

WHEREFORE, Plaintiff respectfully requests judgement in her favor and against Defendant, and an award of compensatory damages, back pay, front pay, the value of lost

benefits, punitive damages, costs, attorney's fees, and such other relief as may be just, proper, and appropriate in the circumstances of this case.

## COUNT V
## FIRST AMENDMENT RETALIATION
## PLAINTIFF v. PSP

82. The preceding paragraphs are incorporated by reference as though set forth fully herein.

83. Plaintiff association with Conrad and Doblovasky was at all times relevant hereto Constitutionally protected.

84. Plaintiff's political speech and association with Conrad and Doblovasky was a matter of public concern protected by the First Amendment.

85. In retaliation for engaging in Constitutionally protected speech and association Plaintiff was deprived of promotion, advancement, educational opportunities and the associated earnings.

86. The depravation significant promotion, advancement, educational opportunities and the associated earnings, would deter a person of ordinary firmness from exercising their Constitutionally protected rights.

87. The facts recited above establish a causal link between the Plaintiff's exercise of Constitutionally protected speech, association and the retaliatory depravation of significant promotion, advancement, educational opportunities and the associated earnings.

WHEREFORE, Plaintiff respectfully requests judgement in her favor and against Defendant, and an award of compensatory damages, back pay, front pay, the value of lost

benefits, punitive damages, costs, attorney's fees, and such other relief as may be just, proper, and appropriate in the circumstances of this case.

Respectfully submitted,

THE HANCHULAK LAW OFFICES, P.C.

By:   s/Gerald J. Hanchulak
      Gerald J. Hanchulak, Esq.
      Attorney ID PA 56320
      Attorneys for Plaintiff

345 Wyoming Avenue, Suite 205
Scranton, PA 18503
(570) 319-6642
ghanchulak@hanchulaklaw.com